UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEW MEXICO

In re:

TOBIAS M. LUNA,

      Debtor.

No. 7-11-14983 TA

NORMA BRITO and
JAMES QUINTANA,

      Plaintiffs,

v.

Adv. No. 12-1071 T

TOBIAS M. LUNA,

      Defendant.

## **MEMORANDUM OPINION**

In this adversary proceeding Plaintiffs ask the Court to declare Defendant's debt to them nondischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4), and/or (a)(6), and to deny Defendant's discharge under 11 U.S.C. §§ 727(a)(3) and/or (a)(4). The Court tried the proceeding on March 14, 2013. This is a core matter. For the reasons set forth below, the Court declares the amount of $13,667.65 nondischargeable under § 523(a)(4) and rules against Plaintiffs' other claims.

I.    <u>FACTS</u>

The Court finds the following facts:

1.    Defendant filed the above-captioned bankruptcy case November 21, 2011.

2.      Defendant was a licensed contractor, and owned a construction company, TML Construction Corporation, a New Mexico corporation ("TML").[1]

3.      Defendant was the sole shareholder of TML and had control over TML at all relevant times.

4.      On or about January 18, 2008, TML and Plaintiffs entered into a contract (the "Contract"), pursuant to which TML agreed to perform construction work on Plaintiffs' house. The work included remodeling portions of Plaintiff's house and building on a substantial addition (together, the "Project").

5.      The Contract price was $134,398.52, payable as follows:

   a.   $60,000—1/18/08

   b.   $60,000—3/24/08

   c.   $10,000—unspecified

   d.   $4,398.52—at completion.

6.      The parties entered into two change orders, the first dated April 30, 2008, for $1,180, and the second dated April 30, 2008, for $2,035.

7.      Plaintiffs made all payments required under the Contract, including the change orders.

8.      There is no completion date in the Contract, but apparently the parties anticipated that the work would be done in about June, 2008.

9.      On February 29, 2008, the State of New Mexico, Regulation and Licensing Department, Construction Industries Division, suspended Defendant's contractor's license for

---

[1] Contractor "qualifying party certificates" are only issued to individuals (*see* Title 14, N.M.A.C. § 14.6.3.8(E)), so a license issued to a corporation must have an individual as its qualifying party.

-2-

nonrenewal. Defendant thought he had completed the paperwork necessary to renew the license, but it turned out he had not. Defendant was not timely informed of the problem because he had moved and the paperwork from the state licensing division was sent to his old address.

10.    Defendant's contractor's license was cancelled May 28, 2008, effective as of February 29, 2008.

11.    TML paid most of its subcontractors, and completed most of the work on the Project. However, TML used some of the money from Plaintiffs to pay bills unrelated to the Project, or to make to unrelated investments.

12.    TML did not complete the Project and materially breached the Contract, causing Plaintiffs damage.

13.    TML's unpaid subcontractors for the Project, which Plaintiffs either had to pay or are liable to, are:

    a.    Aragon Plumbing--$3,315 (plumbing);

    b.    Home Depot--$3,627.48 (tile);

    c.    John Price--$6,042 (tile installation);

    d.    Home Depot--$80 (tile delivery);

    e.    Bruce Hyde--$153 (tile red guard); and

    f.    Luis Villanueva--$549.17 (Cabinet install).

Total: $13,766.65.

14.    TML's unpaid subcontractors for the Project, which Plaintiffs neither paid nor are liable to, are:

    a.    Conrad Construction--$1,650;

-3-

b.      Enchantment Lath & Plaster--$2,400;

c.      Jose Torres--$4,250;

d.      White Rock Construction--$2,100;

e.      Frank's Electric--$4,667.24; and

f.      Fresh & Clean--$351.68.

Total: $11,168.92.

15.     Other items:

a.      Home Depot--$359.15 (Ms. Brito could not remember what this was for);

b.      Post-construction repair/warranty work, either paid for by Plaintiffs or needed; and

c.      Perfection Sheet Metal--$4,323.38 (TML paid the original subcontractor $4,000, but the subcontractor went out of business).

16.     Frank's Electric filed a claim of lien against the Plaintiffs' house on August 16, 2008, but did not seek to foreclose the lien within the two-year statute of limitations set forth in N.M.S.A. § 48-2-10.

17.     Plaintiffs obtained a certificate of occupancy for the remodeled house on or about August, 2008.

18.     Plaintiff Norma Brito was very credible.

19.     Defendant was credible for the most part. As discussed below, the Court did not find Defendant's testimony about the number of horses he owned pre-petition wholly credible.

20.     Plaintiffs obtained a default judgment in state court against TML and Defendant

-4-

in the amount of $89,393.81, of which $63,748.47 was for punitive damages.[2]

21.     There is no evidence that TML or Defendant defrauded Plaintiffs, intended to defraud Plaintiffs, or executed the Contract under false pretenses.   The Court finds that Defendant and TML intended to complete the Contract as agreed and pay all of TML's subcontractors.

22.     Defendant had been a contractor since 1996 or 1997, and he testified that this was the first project he had substantial problems with.  Plaintiffs did not introduce any evidence to the contrary.

23.     Defendant testified that TML intended to pay, with funds from other jobs or sources, all of TML's subcontractors for the Project that TML failed to pay with Plaintiffs' funds.

24.     Defendant's tax returns are filed and available.

25.     Defendant's personal bank statements, and TML's corporate bank statements, are available from bank archives.

26.     Defendant is now a student, does part-time handyman work, rides horses for a local horse auction, and is relatively unsophisticated in business and record-keeping matters.

27.     Plaintiffs introduced no evidence that there may be an unexplained loss of Defendant's assets.

28.     Plaintiffs introduced no evidence that Defendant's financial condition cannot be

---

[2] The judgment purports to determine that the amounts awarded are nondischargeable under § 523(a)(2) and (a)(6), but the Court will not give these determinations collateral estoppel effect because the judgment was entered by default.  *See Doe v. Martinez (In re Martinez),* 2012 WL 1641926, at *6 (Bankr. D.N.M. 2012, citing *Shovelin v. Central New Mexico Elec. Co-op, Inc.,* 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993) (issue must be actually litigated in the prior adjudication).  Furthermore, the nondischargeability

-5-

ascertained with reasonable certainty.

29.     Most of the trial evidence relevant to Defendant's records concerned records for the Project.

30.     Defendant was the sole owner of Aspen Pine Knot Stake Co. ("Aspen"). Defendant diverted an undisclosed portion of the Contract proceeds to Aspen, in an effort to generate profits.  Instead, Aspen's business failed.  Aspen currently has no value.

31.     Defendant listed a single horse on his bankruptcy schedules.  At trial Defendant admitted that he owned a second horse on the petition date, worth about $500.  Defendant testified that he forgot about the second horse because, inter alia, a friend is feeding it for him.

## II.     § 523(a)(2)(A)

Exceptions to discharge are "narrowly construed, and because of the fresh start objectives of bankruptcy, doubt [as to the meaning and breadth of a statutory exception] is to be resolved in the debtor's favor."  *Cobra Well Testers, LLC v. Carlson (In re Carlson),* 2008 WL 8677441, at *2 (10th Cir. 2008), quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

A creditor seeking to except its debt from a debtor's discharge under § 523(a)(2)(A) must prove, by a preponderance of the evidence:

> (1) the debtor made a false representation;
> (2) the debtor made the representation with the intent to deceive the creditor;
> (3) the creditor relied on the representation;
> (4) the creditor's reliance was justifiable; and
> (5) the debtor's representation caused the creditor to sustain a loss.

---

issues were not plead.  The findings appear to be stuck into the state court judgment as an afterthought, which clearly is improper.

-6-

*In re Johnson*, 477 B.R. 156, 169 (10th Cir. BAP 2012), citing *Johnson v. Riebesell,* 586 F.3d 782, 789, n. 3 (10th Cir. 2009).

In the Tenth Circuit, § 523(a)(2)(A) has been narrowly construed to limit the harsh result of non-dischargeability to "frauds involving moral turpitude or intentional wrong." *Johnson*, 477 B.R. at 169, quoting *Driggs v. Black (In re Black),* 787 F.2d 503, 505 (10th Cir. 1986) (abrogated on other grounds by *Grogan v. Garner,* 498 U.S. 279 (1991)).

The Court finds that Defendant did not intend to deceive Plaintiffs. TML did most of the contracted work and paid most of the subcontractors. Plaintiffs were able to obtain a certificate of occupancy. It seems reasonably clear from the evidence that the real difficulty in this case was that TML ran out of money and was forced to cease operations, not that Defendant deceived or defrauded Plaintiffs.

Plaintiff Brito's testimony bears this conclusion out. She testified that the damages she has suffered based on TML's workmanship are in the range of $2,500 (although she also testified that there may be other repairs needed, but she does not know how much they would cost). This testimony, coupled with the evidence about the certificate of occupancy, leads the Court to believe that TML entered into the Contract in good faith, with the intention of fully performing its obligations. In better economic times, TML could well have completed the Contract and made a profit. There is no question TML materially breached the Contract, but the Court does not believe this is a fraud or false pretenses case. Plaintiffs' § 523(a)(2)(A) claim is denied.

III.     § 523(a)(4)

A debt arising from defalcation while acting in a fiduciary capacity is non-dischargeable. 11 U.S.C. § 523(a)(4). To prevail, a creditor must demonstrate the existence of a fiduciary

-7-

relationship between the debtor-defendant and the creditor; a defalcation committed by the debtor-defendant during the course of the fiduciary relationship; and damages. *Hawk Holdings, LLC v. Kalinowski (In re Kalinowski),* 449 B.R. 797, 806 (Bankr. D.N.M. 2011), *affirmed*, 482 B.R. 334 (10th Cir. BAP 2012), citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996).

      A.    <u>Fiduciary Relationship</u>.  A § 523(a)(4) non-dischargeability claim based on alleged defalcation requires "the existence of a fiduciary relationship between the debtor and the objecting party." *Antlers Roof-Truss and Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997). The existence of such a relationship is determined by federal law. *Fowler Bros. v. Young,* 91 F.3d at 1371; *Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464 *3 (10th Cir. BAP 2011).

      Under Tenth Circuit law, a fiduciary relationship exists only where a debtor has been entrusted with money pursuant to "an express or technical trust." *Sawaged*, at *3, citing *Fowler Bros.* and *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir. 1976).

      While the meaning of "fiduciary capacity" under § 523(a)(4) is a matter of federal law, bankruptcy courts rely on the relevant state law to determine if there is a trust relationship. *In re Kalinowski,* 449 B.R. at 806 (state law dictates whether a trust relationship exists); *In re White*, 271 B.R. 213, at *4 (10th Cir. BAP 2010) (same). *See also Wachtel v. Rich (In re Rich)*, 353 B.R. 796, 805-06 (Bankr. S.D.N.Y. 2006) (a debtor will only be considered a §523(a)(4) fiduciary if he owes the fiduciary obligations under applicable state law).

-8-

Plaintiffs base their §523(a)(4) claim on a provision of the New Mexico Construction Industries Licensing Act, N.M.S.A.1978 §§ 60–13–1 thru 60–13–59 (the "Licensing Act"). The Licensing Act provides in relevant part:

> Any license issued by the division shall be revoked or suspended by the commission for any of the following causes:
>
> (A) if the licensee or qualifying party of the licensee willfully or by reason of incompetence violates any provision of the Construction Industries Licensing Act [60–13–1 NMSA 1978] or any rule or regulation adopted pursuant to that act by the division;
>
> ....
> (F) conversion of funds or property received for prosecution or completion of a specific contract or for a specified purpose in the prosecution or completion of any contract, obligation or purpose, as determined by a court of competent jurisdiction[.]

N.M.S.A.1978 § 60–13–23.

In *Allen v. Romero,* 535 F.2d at 621, the Tenth Circuit held that the predecessor to the Licensing Act "clearly imposes a fiduciary duty upon contractors who have been advanced money pursuant to construction contracts." *Id.* The Tenth Circuit also found that the fiduciary capacity was imposed by law. *Id.*

*Allen v. Romero* remains controlling precedent. *See Baines v. Crossingham Trust (In re Baines),* 337 B.R. 392, 403 (Bankr. D.N.M. 2006) (construing the Licensing Act after the legislature changed the word "diversion" to "conversion," finding that "the legislature did not intend to abrogate the holding of *Allen v. Romero* when it changed the language of the statute" and concluding that "*Allen v. Romero* remains controlling law within this Circuit"); *In re Kalinowski,* 449 B.R. at 807 (same).

B.     _Defalcation_.  If a contractor receives funds from an owner for the purpose of paying subcontractors, and the contractor diverts the funds to other uses, such diversion constitutes defalcation for § 523(a)(4) purposes.  _Kalinowski_, 449 B.R. at 806-07; _Baines_, 337 B.R. at 403.  Here, there is no dispute that funds TML held in trust to pay subcontractors were diverted to other uses, so TML committed defalcation.

C.     _Damages_.  The appropriate judgment amount under § 523(a)(4) is the amount of monetary damage caused by the debtor's defalcation.  _See In re Baines,_ 337 B.R. at 405-06 (calculating plaintiffs' damages by the amount they had to pay to subcontractors because of defendant's failure to pay the subcontractors as required by the Licensing Act); _Kalinowski,_ 449 B.R. at 816 (focusing on the amount of damages caused by the diversion of trust funds, rather than the amount diverted).  _See also In re Kuwazaki_, 438 B.R. 355, at *6 (10th Cir. BAP 2010) (creditor must prove the damages resulting from § 523(a)(4) embezzlement); _In re Salamone,_ 78 B.R. 74, 77 (Bankr. E.D. Pa. 1987) (same); _In re Mills_, 2008 WL 2787252 (Bankr. D. Id. 2008) (same).

It is undisputed that TML's failure to pay its subcontractors from the Contract proceeds resulted in $13,766.65 of additional expense to, and/or liability of, Plaintiffs.  Fact #13.  This amount will be declared nondischargeable.

TML failed to pay other subcontractors too, in the total amount of about $15,500.  Fact #14.  Plaintiffs, however, did not have to pay any of these subcontractors, and none of them has a claim against Plaintiffs or their property.[3]  Because Plaintiffs suffered no damage as a result of

---

[3]  Frank's Electric filed a mechanic's lien, but did not foreclose its lien by the statutory deadline.  _See_ N.M.S.A. § 48-2-10.  The lien is therefore unenforceable, and Frank's Electric has no claim against Plaintiffs.  Conrad Construction, Enchantment Lath & Plaster, White Rock Construction, Jose Torres, and Fresh and Clean did not file claims of lien, so Plaintiffs have no potential liability to any of them.

-10-

TML's failure to pay these subcontractors, the amount due and owing to them should not be declared nondischargeable under § 523(a)(4).

Finally, TML did not pay Perfection Sheet Metal $4,323.38, but did pay $4,000 to the original subcontractor that was replaced by Perfection. The original subcontractor went out of business and breached its subcontract. There was no defalcation with respect to this subcontractor, although the $4,323.38 likely would be included in any breach of contract damages calculation.

As the sole principal of TML, Defendant is responsible for TML's breach of trust and defalcation. *See Kalinowski,* 449 B.R. at 812 (holding LLC's manager liable for LLC's breach of trust); *Baines,* 337 B.R. at 406 (bankruptcy courts have imposed personal liability under §523(a)(4) on individuals whose corporations were the technical fiduciary).[4] Plaintiffs therefore will be given a nondischargeability judgment against Defendant in the amount of $13,766.65.

IV.    <u>§ 523(a)(6)</u>

This section excepts from discharge debts for willful or malicious injury by the debtor to another entity or to the property of another entity. Plaintiffs did not pursue this claim at trial, except with respect to the *Mascarenas* claim discussed below. The Court finds there is no evidence in the record supporting a willful and malicious injury claim.

V.    <u>NONDISCHARGEABILITY CLAIM UNDER</u>
<u>*MASCARENAS v. JARAMILLO*</u>

At trial, Plaintiffs argued that they were entitled to a refund of the entire contract price because Defendant became unlicensed during the project. *See Mascarenas v. Jaramillo*, 111

---

[4] An alternative basis for finding Defendant liable for TML's defalcation is Plaintiffs' veil-piercing argument, which essentially was admitted to when Defendant failed to response to Plaintiffs' written discovery.

-11-

N.M. 410, 806 P.2d 59 (1991) (construing N.M.S.A. 60-13-30(A) to allow owner to obtain a full refund of all amounts paid to an unlicensed contractor). Plaintiffs further argued that the amount they are owed under the *Mascarenas* doctrine should be declared nondischargeable under § 523(a)(2)(A), (a)(4), and/or (a)(6).[5]

There is no question that under *Mascarenas*, the project owner may sue to recover all amounts paid under a construction contract to a contractor who turns out to be unlicensed. In closing argument, Plaintiffs' counsel conceded (appropriately, it seems to the Court) that *Mascarenas* would not require Defendant to return any funds paid while he was validly licensed. Thus, Plaintiffs' *Mascarenas* claim is the full contract price less the initial $60,000.

The issue of a contractor losing his license in the middle of a job is a matter of first impression. It is not clear to the Court that the *Mascarenas* rule should be extended to the facts of this case, because here the Defendant was a licensed contractor, applied for a renewal of his license, and thought he had taken the steps required to obtain the renewal.

---

[5] Plaintiffs' *Mascarenas* theory was not plead in the pre-bankruptcy state court action, nor in this adversary proceeding. As far as the Court can tell, the theory was advanced for the first time at trial. It is not clear the Court should consider the matter. It could be that the pleadings were amended by implied consent pursuant to Rule 15(b)(2). "Rule 15(b) permits amendment of a complaint '[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent.'" *U.S. ex. Rel Sharp v. Eastern Okla. Ortho. Center*, 2013 WL 766183, at *3 (N.D. Okla. 2013). "A party implicitly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence. *Id.* "However, implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue." *Id.* citing *Green County Food Mkt v. Bottling Group, LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004). Here, all of the evidence relating to Plaintiffs' *Mascarenas* claim also is relevant to Plaintiffs' contractor trust fund claim and/or fraud claim, so it is difficult to find implied consent on that basis. On the other hand, Plaintiffs' counsel argued the theory in his opening statement, so Defendant was on notice. Defendant never objected. The Court will evaluate the theory, without ruling on the Rule 15(b)(2) issue.

The *Mascarenas* court stated "The purpose of the Act is to protect the public from incompetent and irresponsible builders."  111 N.M. at 413, quoting *Peck v. Ives,* 84 N.M. 62, 66, 499 P.2d 684, 688 (1972).  The court also quoted N.M.S.A. § 60-13-4:

> The purpose of the Construction Industries Licensing Act is to promote the general welfare of the people of New Mexico by providing for the protection of their lives, property and economic well-being against substandard or hazardous construction, alteration, installation, connection, demolition or repair work . . . .

111 N.M. at 413.  The purpose of the Licensing Act would not necessarily be furthered by extending the *Mascarenas* rule to cases where a duly licensed and experienced contractor becomes unlicensed in the middle of a job because he mishandles his renewal paperwork.

The Court need not decide the issue, however, because the Court finds that, even if Plaintiffs could recover some or all of the Contract amount in a state court *Mascarenas* action, such amount would be dischargeable in bankruptcy.

Exceptions to discharge are to be narrowly construed.  *In re Carlson,* 2008 WL 8677441, at *2.  The concepts of fraud, fiduciary duty, defalcation, and/or malicious injury are neither explicit nor implicit in the *Mascarenas* rule.  Rather, the only wrongdoing addressed by *Mascarenas* is the failure to obtain a contractor's license.

Section 523(a)(2) does not apply because there is no evidence that Defendant intended to misrepresent his status as a licensed contractor at any time.  He testified that he thought he had taken the steps necessary to renew his license, and did not find out until much later that the steps had proven ineffective.  Had Defendant known for sure that he was no longer a licensed contractor, he may well have had a duty to inform Plaintiffs of that fact.  Because Defendant did not know that his efforts to renew the license were fruitless, however, there can be no finding of

-13-

the kind required in the Tenth Circuit, i.e., "frauds involving moral turpitude or intentional wrong." *Johnson*, 586 F.3d at 169.

Section 523(a)(4) does not apply because the amounts owed under *Mascarenas* are not trust funds; such amounts are recoverable even if no subcontractors are involved, and neither the statute at issue nor the *Mascarenas* court designated the amounts due to the property owner as trust funds.

Finally, § 523(a)(6) does not apply because the debt owed under *Mascarenas* is not due to injury to person or property--it would be due in full even if the contractor greatly increased the value of the property.

For these reasons, the Court rules against Plaintiffs' argument that the Contract price paid after February 29, 2008 should be declared nondischargeable under any subsection of 11 U.S.C. § 523.

## VI.    § 727(a)(3)

A debtor is not entitled to receive a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). In *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008), the Ninth Circuit stated:

> The purpose of § 727(a)(3) is to make discharge dependent on the debtor's true presentation of his financial affairs. [*Lansdowne v. Cox (In re Cox)]*, 41 F.3d [1294] at 1296 [(9th Cir. 1994)] (citation omitted). The disclosure requirement removes the risk to creditors of "the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records."

-14-

To avoid a § 727(a)(3) problem debtors should produce records that provide creditors:

> "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *In re Martin,* 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992); *In re Kearns,* 149 B.R. 189, 190-91 (Bankr. D. Kan. 1992); *see also Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir. 1992); *In re Cox,* 904 F.2d 1399, 1402 (9th Cir. 1990). The provision ensures that trustees and creditors will receive sufficient information to enable them to "trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *In re Martin,* 141 B.R. at 995; *see also In re Shapiro,* 59 B.R. 844, 848 (Bankr. E.D.N.Y. 1986); *In re Pimpinella,* 133 B.R. at 697; *In re Frommann,* 153 B.R. at 116. Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3). *Meridian Bank,* 958 F.2d at 1230; *In re Underhill,* 82 F.2d 258, 259-60 (2d Cir.), *cert. denied,* 299 U.S. 546, 57 S. Ct. 9, 81 L. Ed. 402 (1936); *In re Zell,* 108 B.R. 615, 627 (Bankr. S.D. Ohio 1989); *In re Schultz,* 71 B.R. 711, 717 (Bankr. E.D. Pa. 1987); *In re Graham,* 111 B.R. 801 (Bankr. E. D. Ark. 1990). On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs. *In re Frommann,* 153 B.R. at 117; *In re Pimpinella,* 133 B.R. at 698; *In re Shapiro,* 59 B.R. at 848.

*In re Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996). *See also Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir. 1992) ("the purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge").

Determination of a § 727(a)(3) objection is a two-step process. In the first step, the creditor has the burden of establishing that the debtor's records are inaccurate or inadequate.

> It is up to the creditor to establish a prima facie case for denial of discharge under § 727(a)(3). Only if the creditor accomplishes that initial task does the burden shift to the Debtor to come forward with an explanation for the lack of recorded information.

*McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 241 (Bankr. D. Colo. 2005), citing *PNC Bank v. Buzzelli (In re Buzzelli),* 246 B.R. 75, 117, n. 17 (Bankr. W.D. Pa. 2000), and *Beneficial*

-15-

*Mortgage Co. v. Craig (In re Craig)*, 140 B.R. 454, 458 (Bankr. N.D. Ohio 1992). *See also In re Gordon*, 83 B.R. 78, 81 (Bankr. S.D. Fla. 1988) (once creditor shows debtor's records are inaccurate, the burden shifts to the debtor to justify the nonexistence of the records); *In re Hernandez*, 2009 WL 6699684, at *2 (Bankr. S.D. Cal. 2009) (same).

In the Tenth Circuit, the creditor's initial burden of proof is to show that the debtor "failed to maintain and preserve adequate records" and "that the failure made it *impossible* to ascertain [the debtor's] financial condition and *material business* transactions." *In re Brown*, 108 F.3d 1290, 1295 (10th Cir. 1997), *citing In re Folger,* 149 B.R. 183, 188 (D. Kan. 1992) (emphasis added in *Brown*).

The records "need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them." *Phouminh*, 339 B.R. at 241, quoting *In re Stewart,* 263 B.R. 608, 615 (10th Cir. BAP 2001).

If the creditor establishes its *prima facie* case, the burden shifts to the debtor to justify its lack of records. *Brown,* 108 F.3d at 1295; *Phouminh*, 339 B.R. at 241; *Gordon*, 83 B.R. at 81; *Devaul,* 318 B.R. at 837. Courts often use the following standard for assessing a debtor's justification:

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.

*Meridian Bank*, 958 F.2d at 1231, quoting *In re Wilson*, 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983). *See generally Devaul*, 318 B.R. at 836 (thorough analysis of debtor's burden of

-16-

justification).

It is common to evaluate the debtor's education, sophistication, and experience when considering whether a lack of records is justifiable. *See Eggert v. Sendecky (In re Sendecky)*, 283 B.R. 760, 766 (8th Cir. BAP 2002) (proof that debtor was poorly educated, unsophisticated, and lacking in business experience held to be sufficient justification for lack of records); *Devaul*, 318 B.R. at 838-39 (court found justification based on, inter alia, debtor's limited education and lack of sophistication). Some courts have combined debtors' justification for a lack of records with debtors' submission of such records as they can find, and/or an oral explanation of their financial condition. *See, e.g., In re Ogden*, 251 B.R. 441, at *6 (10th Cir. BAP 1999) (relying on debtor's testimony about unavailable records to reverse entry of summary judgment against debtor on § 727(a)(3) claim); *Hernandez*, 2009 WL 6699684, at *3 (court gave the debtors an opportunity to explain how they spent cash advances, but held they were unable to do so); *In re Sauntry*, 390 B.R. 848 (Bankr. E.D. Tex. 2008) (court considered debtors' explanation why they operated on a cash basis, and also review debtors' tax returns, pay stubs, credit card statements, and the like, and concluded that debtor's failure to maintain records was justified).

Here, Plaintiffs' primary argument is that Defendant kept insufficient records relating to the Project. It is true that Defendant has few Project records, but those records were TML's, not Defendant's. There is no requirement that the owner of a failed business keep business records for years as a condition to obtaining his individual discharge. *See e.g. In re Summers*, 320 B.R. 630, 638 (Bankr. E.D. Mich. 2005) (failure to retain business records not relevant to a 727(a)(3) action brought against the individual owner of the business); *In re Hobbs*, 333 B.R. 751, 757 (Bankr. N.D. Tex. 2005) (quoting and following *Summers*). *Cf. In re Bishop*, 420 B.R. 841, 851

-17-

(Bankr. N.D. Ala. 2008) (citing *Summers* but noting that corporate records could be relevant if needed to determine the individual debtor's financial condition).

The Project was started in January, 2008, almost four years before Defendant filed his bankruptcy case. Case law ruling on § 727(a)(3) claims focuses on the last two years before filing. *See, e.g. In re Sfadia,* 2007 WL 7540987 (9th Cir. BAP 2007) (approving a two-year look-back period); *In re Hahn*, 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007) (the look-back period is "reasonable" and varies on a case-by-case basis, but is understood to encompass at least two years). The look-back period seldom goes as far back as far as Plaintiff would like to go. The Court finds that Defendant's failure to preserve TML's Project records is justifiable, all things considered.

In addition, the primary records are either in existence (the Contract, recent individual income tax returns, and recent individual bank statements, for example), or readily obtainable (e.g. corporate tax returns, older tax returns, corporate bank statements, and older bank statements, checks, and deposit slips).

Furthermore, there is no evidence that significant assets are missing or unexplained. From what the Court can tell, Defendant lost his construction business in 2008, lost his contractor's license, became a student, and has been supporting himself for some time with student loans and odd jobs. Defendant has no substantial assets (he filed bankruptcy with about $12,500 in total assets), and there is no indication that Defendant had substantial assets after TML and Aspen failed in 2008 or 2009.[6]

Finally, Defendant is not particularly sophisticated in business or record-keeping matters,

---

[6] Neither the Chapter 7 trustee nor the United States Trustee's office appears concerned about the status of Defendant's records.

and filed his case as a consumer bankruptcy case.

All things considered, the Court finds that Plaintiffs did not carry their initial burden of demonstrating that Defendant failed to maintain and preserve adequate records. Furthermore, the Court finds that Defendant provided an adequate justification for his recordkeeping practices.

VII.  § 727(a)(4)

Under 11 U.S.C. § 727(a)(4), a debtor is not entitled to receive a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—

> (A) made a false oath or account;
> (B) presented or used a false claim;
> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

"In order to deny a discharge pursuant to [§727(a)(4)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact." *Bishop v. Mulholland (In re Mulholland),* 2011 WL 4352293, at *4 (Bankr. D.N.M. 2011), *citing Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1294 (10th Cir.1997).

Courts consider the monetary value of the assets at issue in determining whether the debtor acted with fraudulent intent. *In re Cary,* 938 F.2d 1073 (10th Cir. 1991). A false oath is "material" if it bears a relationship to debtor's estate or concerns discovery of assets or existence of disposition of debtor's property.

Badges of fraud a bankruptcy court should consider include: (1) concealment of conversions; (2) conversion of property on eve of bankruptcy; (3) gratuitous transfers of property

-19-

by debtor; and (4) debtor's continued use of transferred property. *In re Garland,* 417 B.R. 805 (10th Cir. BAP 2009). Debtors have a duty to carefully and accurately complete their statements and schedules, especially since they sign them under penalty of perjury. *In re Vigil,* 414 B.R 743 (Bankr. D.N.M. 2009).

Plaintiffs supported their §727(a)(4) position with the following arguments, while Defendant responded as follows:

| Plaintiffs' Argument | Defendant's Response |
|---|---|
| | |
| Defendant did not list TML's creditors on his bankruptcy schedules | Defendant was under no obligation to list such creditors; it is sometimes done out of an abundance of caution, but is not required; |
| Defendant listed certain collection agencies as creditors, but not the creditors for whom the collection agencies were acting as agents | Defendant did not have the information about the principals when the schedules were completed, but did have the names, addresses, and claim amounts of the collection agencies; |
| Defendant did not list his membership interest in Aspen | Defendant forgot about Aspen, which failed in 2008 and has no value |
| Defendant owned two horses on the petition date, but only listed one horse on his bankruptcy schedules | Defendant had two horses pre-petition. He gave one horse to his then-girlfriend several years pre-petition. She gave it back to him (also pre-petition) because she couldn't feed it. When he filed bankruptcy a friend of his was keeping and feeding the horse, so he forgot to add it to his schedules |
| Defendant did not disclose a 2008 lawsuit against him captioned *Frank's Electric, LLC v. TML construction and Toby Luna* | The SOFA only requires disclosure of actions to which the debtor is or was a party within one year of the petition date. The *Frank's Electric* case was filed in 2008 and concluded shortly thereafter by default judgment |
| In Schedule I, Defendant did not identify the source of his income | Not material; source varied; Defendant is a student and his income (apart from student loans) is derived from various odd jobs |

Most of Plaintiffs' arguments are without merit. Defendant has no obligation to list corporate creditors on his personal bankruptcy schedules. The failure to disclose the creditors for whom the collection agencies were acting is not material. The failure to list the Aspen

ownership interest is not material, since it is undisputed that Aspen became worthless in 2008.[7]

Defendant had no obligation to list the *Frank's Electric* lawsuit, but did list Frank's Electric as an unsecured creditor, with a claim based on a 2009 default judgment. Defendant's failure to disclose that his meager $600 per month income came from odd handyman jobs is not material.

The Court is somewhat concerned about Defendant's failure to list his second horse. The Court was not satisfied that Defendant's testimony on this point was completely candid, and Defendant did not explain why he did not amend his schedules to include the second horse once the issue arose. Nevertheless, the undisputed testimony at trial was that the second horse was worth about $500. Defendant has claimed the federal exemptions, and has about $5,365 available in his unused § 522(d)(5) "wild card" exemption. Defendant's failure to amend his bankruptcy schedules to add the second horse (and the Aspen interest) is irksome, but the failure to schedule these assets is not material to creditors, and is not sufficient to deny Defendant's discharge.

VIII.   CONCLUSION

Defendant's § 727 discharge will not be denied. Defendant's obligations to Plaintiffs will be declared nondischargeable to the extent of $13,667. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law under Fed.R.Bankr.P. 7052. An appropriate judgment will be entered.

_____
Hon. David T. Thuma,
United States Bankruptcy Judge

Entered on docket: March 27, 2013

_____
[7]  The Court has no reason to question Defendant's testimony that he forgot about his interest in Aspen because Aspen went out of business and has no value. Plaintiffs did not challenge the testimony.

-21-

Copies to:

Scott Turner
500 Marquette Ave., NW, Suite 1480
Albuquerque, NM 87102

Brandon Hertzler
423 Sixth Street, NW
Albuquerque, NM 87102